IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALAN M. SADAKA,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

C.A. 11-276-RGA

## MEMORANDUM OPINION

---

John Grady, Esq., Dover, Delaware; Attorney for Plaintiff Alan M. Sadaka.

Charles M. Oberly, III, United States Attorney, Wilmington, Delaware; Patricia A. Stewart, Special Assistant United States Attorney, Philadelphia, Pennsylvania; Attorneys for Defendant Michael J. Astrue, Commissioner of Social Security.

---

August 22, 2012
Wilmington, Delaware

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Plaintiff Alan M. Sadaka appeals the denial of his application for disability insurance benefits under Title II of the Social Security Act and for supplemental security income under Title XVI of the Social Security Act (collectively "DIB"). Jurisdiction exists pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3).

Pending before the Court are cross-motions for summary judgment filed by Sadaka and the Commissioner. Sadaka's motion for summary judgment asks the Court to remand the case to the Commissioner with instructions to award him DIB, or, in the alternative, to reconsider the Commissioner's decision in light of this opinion. The Commissioner's cross-motion for summary judgment requests that the Court affirm the decision to deny benefits.

## BACKGROUND

### 1. Procedural History

Sadaka filed a request for disability on May 2, 2008. The alleged disability onset date was February 5, 2002. His claim was denied both initially and upon reconsideration. An oral hearing was held on November 23, 2009 before an administrative law judge ("ALJ"). The ALJ denied Sadaka's application for benefits. The Appeals Council declined to overturn that decision, which became the final order of the agency. Sadaka filed a Complaint (D.I. 2) seeking judicial review of the ALJ's decision and a motion for summary judgment seeking benefits (D.I. 17). The Commissioner filed a cross-motion for summary judgment to affirm the ALJ's denial of benefits. (D.I. 19).

## 2. Relevant Medical History

In his disability application, Sadaka alleged that he was disabled due to chronic low back pain, degenerative disc disease, right knee and leg problems, depression, high blood pressure, high cholesterol, asthma, and heartburn. Tr. at 165. Sadaka's appeal, however, is limited to the ALJ's evaluation of his back pain and self-reported daily activities. Thus, only medical history relevant to his appeal is summarized here.

Sadaka began experiencing back pain after a September 14, 2001 motor vehicle accident. Tr. at 427. At that time, he worked for Baltimore Gas and Electric as a service technician. Tr. at 46, 54. Sadaka attempted to continue working despite his injury, but he lost his job in January 2002 as a result of back pain. Tr. at 18. Sadaka received conservative treatment, including chiropractic treatment, back bracing and interventional therapy with epidural steroid injections, but these measures were ineffective. Tr. at 477. Sadaka eventually saw Dr. Stephen Ludwig, an orthopedic surgeon, for significant back pain in October 2006. Tr. at 168, 427. At the referral of Dr. Ludwig, Dr. Kerry Thompson, neurologist, performed an L5-S1 discogram. Tr. at 388-90, 426. This diagnostic showed evidence of a diskopathic pain mechanism that correlated with Sadaka's history of back pain. Tr. at 390. Dr. Thompson characterized the pain as "debilitating." Tr. at 390. Thereafter, Dr. Ludwig diagnosed Sadaka with severe degenerative lumbar disc disease and recommended surgery. Tr. at 424-25. Dr. Ludwig performed fusion surgery at the L5-S1 vertebrae successfully in June 2007. Tr. at 391-418. In his two week follow-up appointment, Dr. Ludwig noted that Sadaka's pain was reported to be controlled, his spine was stable, and Sadaka should continue his activities of daily living as tolerated. Tr. at 479. Sadaka again saw Dr. Ludwig in August 2007. Tr. at 420. At this appointment, Sadaka reported that he was "functionally doing better." Tr. at 420. His pain was under better control,

although he continued to take "high-level narcotics." Tr. at 420 (presumably, methadone and oxycodone, Tr. at 19). Dr. Ludwig opined that Sadaka was doing well, assigned physical therapy, and discussed weaning him off the pain medication. Tr. at 420. The next appointment was in December 2007 and similarly positive, with Dr. Ludwig noting that Sadaka was doing well and that Sadaka was happy with his level of function and pain relief. Tr. at 622.

Dr. Ludwig's final treatment notes are from October 2009. Tr. at 621. Dr. Ludwig noted that Sadaka's pain symptoms had progressively worsened since he was off narcotics. Tr. at 621. Dr. Ludwig also noted, however, that Sadaka was "improving clinically." Tr. at 621. Dr. Ludwig assigned further physical therapy and made plans for a six month follow-up appointment. Tr. at 621. Also in October 2009, Sadaka underwent an x-ray that reported his fusion as having an "unremarkable appearance" with no additional findings. Tr. at 670. The same month, Dr. Ludwig filled out a "Residual Functional Capacity Questionnaire" for Sadaka's disability application. Tr. at 606-09. On the Questionnaire, Dr. Ludwig concluded that Sadaka would necessarily miss at least four days of work per month due to his symptoms. Tr. at 609. Sadaka also completed a "Function Report" concerning his daily activities. Tr. at 176-85. In this report, Sadaka reported that he lived alone, did household chores and repairs, prepared his own meals, cut his grass, and shopped for his own food. Tr. at 176-79.

On November 23, 2009, the ALJ conducted an in-person hearing where Sadaka testified to his impairments and symptoms. Tr. at 38. Sadaka testified that, post-surgery, "I was better than before, but I wasn't great." Tr. at 50. He testified that he still suffered from pain going down his right leg and into his toes. Tr. at 50. Sadaka testified that every day is different, that some days were "bad" and other days were "not-so-bad." Tr. at 52. On a good day, he rated his pain at four out of ten, but commented that such days were rare. Tr. at 52. He was capable of

4

doing household chores, but those things were "very difficult" for him to do and afterwards his pain was much worse. Tr. at 53. He was required to lay down three or four times per day to take the weight off his spine. Tr. at 53. He also stated that for a period of time after his surgery, his pain was lessened by pain medication, but that he no longer took pain medication. Tr. at 56-57. He also was undergoing psychological counseling and physical therapy. Tr. at 60.

A vocational expert then testified. The ALJ presented the expert with hypotheticals corresponding to various possible combinations of Sadaka's limitations. Tr. at 64-67. The expert considered those limitations and testified that such a person, if he did not have to lie down four to five times a day, or miss one day of work per week, would be capable of working a number of jobs that existed in the economy, including jobs as an inspector, price marker, table worker, and assembler. Tr. at 65-67.

On March 23, 2010, the ALJ held that Sadaka was not disabled. Tr. at 30.

## STANDARD OF REVIEW

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour,* 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel,* 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel,* 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the Court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence. *See Monsour,* 806 F.2d at 1190-91.

## DISCUSSION

**1. Disability Determination Process**

Title 11 of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date she was last insured. *See* 20 C.F.R. § 404.131. A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, a finding of non-disabled is required. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. If the claimant is not suffering from a severe impairment or a combination of impairments that is severe, a finding of non-disabled is required. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

7

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii): *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e). At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [his] impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all

of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

The ALJ applied the sequential analysis in rejecting Sadaka's claim. Tr. at 17-30. The ALJ found that Sadaka met the insured status requirement of the Social Security Act and had not been engaged in substantial gainful activity since the alleged disability onset date of February 5, 2002. Tr. at 17. This satisfied the first step of the sequential analysis. At the second step, the ALJ determined that Sadaka suffered from multiple severe impairments, including lumbar degenerative disc disease with status-post June 2007 lumbar fusion, depression, and a right knee disorder. Tr. at 17. The ALJ also determined that Sadaka's alleged obesity, hypertension, asthma, and history of opiate dependency due to chronic pain medication were not severe impairments. Tr. at 18-20. Because the ALJ found at least one severe impairment, he continued to the third step of the sequential analysis to determine whether any impairment or combination of impairments medically equaled one of the listed impairments that statutorily presume disability. Tr. at 20-22. The ALJ held that none of Sadaka's impairments equaled a listed impairment. Tr. at 20.

The ALJ then continued to the fourth step, where he determined Sadaka's residual functional capacity. Tr. at 22. The ALJ stated that he considered all of Sadaka's symptoms to the extent they reasonably could be accepted based on the objective medical evidence. Tr. at 22. The ALJ determined that Sadaka retained the residual functional capacity to perform certain limited types of sedentary work. Tr. at 22. The work was limited to jobs that involved lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Tr. at 22. At the fifth step, the ALJ determined that Sadaka was not capable of his previous work as a service technician. Tr. at 28. The ALJ then adopted the

9

vocational expert's opinion that Sadaka was capable of working a number of jobs that existed in significant numbers in the local and national economy. Tr. at 28-29. For these reasons, the ALJ held that Sadaka was not disabled within the meaning of the Social Security Act. Tr. at 23, 30.

## 2. Appeal and Analysis of the ALJ's Decision

Sadaka appeals the ALJ's decision, making three arguments: (1) the ALJ erred by rejecting Sadaka's orthopedic surgeon's opinion that he would necessarily miss four work days per month due to his symptoms (D.I. 18, p. 14); (2) the ALJ erred when he failed to account for the findings of Sadaka's neurologist in making the ALJ's credibility determinations about Sadaka's subjective complaints (*Id.* at 17-18); and (3) the ALJ wrongfully emphasized Sadaka's daily activities in making the residual functional capacity determination. (*Id.* at 19). The Court discusses each of these arguments in turn.

Sadaka first argues that the ALJ improperly denied weight to a key conclusion of his treating physician, Dr. Ludwig. Specifically, the ALJ erred by not crediting Dr. Ludwig's conclusion that Sadaka would necessarily miss at least four days of work per month due to his impairments. In making this conclusion, Sadaka argues, the ALJ ignored Dr. Ludwig's specialty as an orthopedic surgeon, the fact that Dr. Ludwig actually performed the back surgery, and the history of the treating relationship dating back to 2001. Instead, Sadaka argues, the ALJ improperly relied on a single x-ray taken in October 2009, seven years after the alleged disability onset date. An ALJ may reject a well-supported treating physician's opinion only on the basis of contradictory medical evidence. *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). That opinion may not be rejected for no reason or the wrong reason. *Id.* at 317. When there is contradictory medical evidence, the ALJ must carefully evaluate how much weight to give the

10

treating physician's opinion and provide an explanation as to why that opinion was not given controlling weight. *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008).

The ALJ's decision to deny credit to Dr. Ludwig's conclusion that Sadaka would necessarily miss at least four days of work each month was supported by substantial evidence. The ALJ properly considered the extent of Sadaka's treatment relationship with Dr. Ludwig. The ALJ conducted a lengthy review of Sadaka's medical history, beginning with the September 2001 car accident that triggered his back problems.[1] Tr. at 23. The ALJ discussed the various therapies Sadaka attempted to unsuccessfully treat his back pain. Tr. at 23. The ALJ noted that these conservative treatments failed and that Dr. Ludwig performed a "Stage II posterior spinal fusion at L5-S1 with posterior non-sentimental instrumentation" in June 2007. Tr. at 24. The ALJ documented Dr. Ludwig's post-surgery treatment through October 2009, including Dr. Ludwig's opinion that Sadaka was doing "very well" and happy with his levels of function and pain relief. Tr. at 24. The ALJ demonstrated that he understood the extent of the doctor-patient relationship and fairly incorporated those details into the opinion. This included Dr. Ludwig's status as Sadaka's treating orthopedic surgeon who actually performed the back surgery. Sadaka's insistence to the contrary is without merit.

Further, the ALJ's decision to deny Dr. Ludwig's opinion full credit was based on far more than a single October 2009 x-ray. For example, the ALJ relied on Dr. Ludwig's notations that, within two weeks of the June 2007 surgery, Sadaka retained full motor strength, had grossly

---

[1] Although Sadaka argues that the ALJ failed to consider the fact that Dr. Ludwig began treating Sadaka in 2001 (D.I. 18, p. 16), the records state that Dr. Ludwig's treatment did not start until October 2006. Tr. at 168, 427. Sadaka further argued that the ALJ never made an alternative conclusion as to how many days Sadaka would miss from work each month. (D.I. 18, p. 16). Sadaka, however, cites no law suggesting that the ALJ had a duty to make this determination. Finally, Sadaka argues that the ALJ failed to adequately address Dr. Ludwig's orthopedic specialty and the fact that he was the physician who actually performed the surgery. (D.I. 18, p. 16). The record shows, however, that the ALJ addressed these facts and incorporated them into his analysis. Tr. at 23-24.

intact sensation, equal reflexes, and was instructed to resume activities of daily living as tolerated. Tr. at 421. Dr. Ludwig's observations from December 2007 further support the ALJ's decision:

> [Sadaka] is doing very well. He is happy with his level of function and level of pain relief. His pain is much more diminished…He is neurologically intact. He stands well balanced in the coronal and sagittal planes…AP and lateral of the lumbar spine shows good maintenance of alignment. No evidence of hardware failure…At this juncture, [Sadaka] is doing well.

Tr. at 622. The ALJ also relied on a key observation from Dr. Ludwig's October 2009 records: "At this point, Mr. Sadaka is improving clinically." Tr. at 621. This observation is important because it was made the same month that Dr. Ludwig opined that Sadaka would necessarily miss four days of work per month. Tr. at 609. Although Dr. Ludwig's October 2009 appointment notes also state that Sadaka's pain progressively worsened after he went off narcotics, at no point do they suggest that the pain was incapacitating. Tr. at 621. If Dr. Ludwig had actually observed significantly limiting symptoms, it follows that he would have simply stated so in his treatment records, rather than repeatedly noting improvement over time. Further, Sadaka's physical therapist stated that exercises decreased Sadaka's pain.[2] These inconsistencies provided a reasonable basis for the ALJ to deny full credit to Dr. Ludwig's opinion.

The inconsistencies did not stop there, however. Dr. Ludwig's opinion was also undermined by the internal inconsistency of the Residual Functional Capacity Questionnaire he completed on Sadaka's behalf. On one hand, the Questionnaire claimed that Sadaka would miss at least four days of work per month due to his symptoms. Tr. at 609. On the other hand, the Questionnaire stated that Sadaka was "occasionally" capable

---

[2] At a November 2009 physical therapy appointment, Sadaka reported, "I have pain, but the pain decreases a lot after I do my exercises." Tr. at 648.

12

of performing the following physically demanding activities: "twist," "stoop," "crouch/squat," "climb ladders," and "climb stairs." Tr. at 609. In addition, Sadaka had no problems "reaching, handling, or fingering." Tr. at 609. Perhaps most significantly, Dr. Ludwig concluded that Sadaka was "frequently" capable of carrying ten pounds or less, "occasionally" capable of carrying twenty pounds, and "rarely" (but not "never") capable of carrying fifty pounds. Tr. at 608. All of these conclusions were made in the context of a "competitive work situation." Tr. at 608. These inconsistencies provided the ALJ with an additional basis to discredit the conclusion that Sadaka would necessarily miss "[a]bout four days per month" from work. Tr. at 609.

The ALJ thus took into account the entirety of Dr. Ludwig's relevant treatment records, citing specific progress notes and examinations. The ALJ did not merely rely on a single x-ray in declining to credit Dr. Ludwig's opinion. That is not to say that it was incorrect to rely on the x-ray in the context of the entire record. To the contrary, the x-ray provided additional objective evidence that Sadaka's back was stable post-surgery. The x-ray diagnostic findings follow:

> All vertebral bodies are well aligned. Prior fusion at L5-S1 identified, stabilized by metallic hardware including transpedicular screws. There is a prosthetic spacer at the L5-S1 level.
>
> No fracture or compression deformity is identified. All disc spaces are well maintained.
>
> IMPRESSION: UNREMARKABLE APPEARANCE OF PRIOR L5-S1 FUSION. THERE ARE NO ADDITIONAL SIGNIFICANT FINDINGS.

Tr. at 670. These objective findings reflected stability in Sadaka's back condition. The ALJ was entitled to consider them in determining Sadaka's residual functional capacity. He had the statutory authority to choose which evidence to credit among conflicting evidence, so long as he does not reject evidence for no reason or the wrong reason. *See Mason v. Shalala*, 994 F.2d

13

1058, 1066 (3d Cir. 1993). Dr. Ludwig's records did not contain observations of extremely limiting symptoms and therefore do not support his "check-the box" conclusion that Sadaka would necessarily miss four days of work per week.[3] Moreover, Dr. Ludwig's opinion regarding Sadaka's physical capacity to work a certain number of days per month intruded into the ALJ's sole authority to determine the claimant's residual functional capacity. *See Bassler v. Comm'r of Soc. Sec.*, 2012 WL 393660, n.1 (W.D. Pa. 2012). For all these reasons, there was substantial evidence to support the ALJ's decision to disregard Dr. Ludwig's conclusion that Sadaka would miss four days of work per month due to his impairments and symptoms.

Sadaka next argues that the ALJ failed to give due weight to his subjective complaints of pain. "In order for an ALJ to reject a claim of disabling pain, he must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990). Sadaka argues that ALJ ignored the objective findings of his neurologist, Dr. Kerry Thompson. These findings supposedly supported his subjective complaints:

> Clinically significant diagnostic injection results have been observed at L5-S1. As summarized above, there is unequivocal evidence for a major underlying diskopathic pain mechanism, which, in my opinion, closely correlates with and best explains this patient's long-standing debilitating lower back condition.

Tr. at 390. Sadaka argues that the ALJ's failure to incorporate Dr. Thompson's findings into the opinion was error. The ALJ, however, did not ignore this evidence. Although the ALJ did not mention Dr. Thompson by name, he noted that Sadaka underwent "a discogram that revealed unequivocal evidence for a major underlying discopathic pain mechanism at L5-S1 that correlated to the claimant's pain complaints." Tr. at 24. This was an accurate paraphrase of Dr.

---

[3] Forms that require physicians to only check boxes and fill in blanks are considered weak evidence absent thorough treatment reports in support. *See id.* at 1065.

14

Thompson's findings. Further, the ALJ did not err by declining to give weight to Dr. Thompson's opinion that Sadaka's back pain was debilitating. First, the question of whether a condition is debilitating, i.e., disabling, is one reserved to the Commissioner. *Ray v. Astrue*, 649 F. Supp. 2d 391, 400 (E.D. Pa. 2009). Second, Dr. Thompson made these findings before Sadaka underwent back surgery.[4] The record is replete with evidence that the surgery provided Sadaka with considerable pain relief. *See, e.g.,* Tr. at 622. Findings that only correspond to Sadaka's pre-surgery condition do not provide objective evidence in support of Sadaka's post-surgery subjective complaints. The ALJ therefore was not required to explain why his conclusion conflicted with Dr. Thompson's findings.

Sadaka's final argument is that the ALJ erred by excessively relying on evidence of his daily activities in determining his residual functional capacity. The ALJ considered Sadaka's testimony and a "Function Report" completed by Sadaka. Tr. at 52-53, 176-83. From this evidence, the ALJ noted the following:

> It bears reiteration that the claimant testified that he is independent regarding personal care and he is capable of performing all housework as consistent with the record. He is clearly able to reside independently, be self-reliant and be self-sufficient. His Function Report corroborates independence of daily activities and no problems with social functioning as admitted therein.

Tr. at 27. Sadaka argues that the ALJ erred by relying on Sadaka's personal activities, arguing, "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). The ALJ, however, never imposed this requirement on Sadaka. It is appropriate for an ALJ to consider a

---

[4] The residual functional capacity determination was made in regard to Sadaka's capabilities post-surgery. Sadaka's evidence in support of his claim for disability, including Dr. Ludwig's RFC Questionnaire, chiefly related to his post-surgery capabilities. The ALJ properly evaluated his claim accordingly.

15

claimant's statements regarding his daily activities when those statements are inconsistent with complete disability. *See Giese v. Comm'r of Soc. Sec.*, 251 F. App'x 799, 803 (3d Cir. 2007).

In the "Function Report," Sadaka stated that he lived alone in a trailer, handled his personal hygiene, did laundry, cleaned the house, and prepared his own meals. Tr. at 176. He took care of his dog with the assistance of his brothers. Tr. at 177. He did household repairs, cut the grass, and whacked the weeds. Tr. at 178. He shopped for food, attempted to go outside at least twice a day, and was in frequent contact with his family. Tr. at 179-80. He admitted no problem with paying attention and got along with authority figures. Tr. at 181, 184. It was perfectly acceptable for the ALJ to rely on this information in determining Sadaka's residual functional capacity. Sadaka cites *Smith* to the contrary, but that case is inapposite. There, the ALJ was overturned for relying on activity that the claimant only engaged in sporadically and for very short periods of time. *See Smith*, 637 F.2d at 971-72. In contrast, the ALJ here based his findings on Sadaka's regular and continuous daily activities. When asked how often he did daily chores, Sadaka admitted, "I pretty much am always doing these things. It [seems] I never really stop." Tr. at 178. This admission provides evidence inconsistent with a finding of complete disability. The ALJ did not error by relying on Sadaka's self-reported daily activities in his analysis.

Sadaka has failed to establish that the ALJ lacked substantial evidence in determining he was not disabled. His request for summary judgment is therefore denied. An appropriate order will follow.